Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or to amend the award, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner with minor modifications as follows:
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner and in a Pre-Trial Agreement as
STIPULATIONS
1. At all times relevant to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At all times relevant to this claim, the employment relationship existed between plaintiff-employee and defendant-employer.
3. At all times relevant to this claim, the Wausau Insurance Companies was the carrier on the risk.
4. The parties stipulated to the fact that, if relevant, the plaintiff would receive maximum workers' compensation benefits relative to her average weekly wage.
5. The plaintiff has not worked for the defendant-employer since February 13, 1993, the date of plaintiff's alleged injury by accident.
6. The plaintiff's medical records from Dr. Barbara Smith and Dr. Irving Lugo are received into evidence.
********
Based upon the competent evidence adduced from the record, the Full Commission adopts the findings of fact of the Deputy Commissioner with minor modifications and finds as follows:
FINDINGS OF FACT
1. As of February 12, 1993, the plaintiff served as executive director for defendant-employer. This was an organization that provided treatment and education for substance abuse. The plaintiff directed defendant-employer's operations and supervised its personnel. She had held her position and performed these duties since defendant-employer's inception in July 1991.
2. From April 1980 through July 1991, the plaintiff had been executive director of defendant-employer's predecessor, High Point Drug Action Council. She had performed similar duties as she did for defendant-employer. From 1972 through 1980, the plaintiff had been the clinical director for High Point Drug Action Council, until her promotion to executive director in April 1980.
3. Plaintiff, as executive director of defendant-employer, answered only to its Board of Directors. The Board and its members, collectively, were her superiors.
4. On February 12th and 13th, 1993, plaintiff attended a retreat at Quails Roost just outside of Durham, North Carolina. The initial purpose of the retreat was for plaintiff and members of the management team to meet with the Board and to discuss long-term planning.
5. Prior to the scheduled retreat, the Chairman of the Board of defendant-employer, David McCoy, received results from a staff survey which had been taken by the Employment Security Commission. The results of the survey indicated significant problems with the staff's perception of both the efficiency and fairness of management. The survey results were particularly low on questions regarding plaintiff's performance and abilities.
6. David McCoy distributed the numerical part of the survey results to some of the Board members on or about February 4, 1993. Board members at that meeting, reached a decision that the other Board members should have the survey results and that the results should be a topic of discussion at the Quails Roost retreat.
7. Shortly before the plaintiff was scheduled to meet with the Board, at the scheduled retreat, the Board's chairman, David McCoy, handed the plaintiff a document and told her to read it. Mr. McCoy further advised her that the Board wanted to talk with her about the contents of the document. The document itself was the results of the survey. This document contained negative and offensive comments about the plaintiff.
8. During plaintiff's meeting with the Board of Directors on February 12, 1993, she was asked questions about the results of the survey. Plaintiff was asked to explain her opinions and impressions about why the results of the survey were so poor.
9. There is conflicting evidence and testimony as to whether the questions asked of plaintiff by the Board members were done in a hostile, abusive, aggressive and intimidating manner, or whether they were asked in a businesslike and professional manner. Based on the greater weight of the evidence, the questioning by some Board members was aggressive and may have been perceived by plaintiff as being accusatory, intimidating and hostile.
10. After meeting with the Board of Directors of defendant-employer, plaintiff returned to her room where she became emotionally agitated, upset, tearful and nauseous.
11. The following morning plaintiff again met with the Board, with other members of her management team. The survey results were again discussed, at which time plaintiff and other members of the management team were excused. The Board subsequently went into executive session, and voted to offer plaintiff a new position, as Director of Marketing for defendant-employer and also voted to give her a five percent pay increase.
12. During a break that morning, plaintiff slipped out of the meeting room and left Durham. Plaintiff traveled to her home in High Point, North Carolina.
13. Plaintiff was given two weeks to accept her new position and when she did not respond, she was terminated by the Board of Directors.
14. On February 15, 1993, the plaintiff spoke by telephone with Dr. Irving Lugo, a psychiatrist associated with defendant-employer. Dr. Lugo noted that the plaintiff, since meeting with the Board, had been upset, crying and unable to sleep, eat, concentrate or handle herself. Dr. Lugo prescribed Valium for the plaintiff and made plans to see her in two days.
15. From February 17, 1993 through March 10, 1993, Dr. Lugo saw and treated the plaintiff on five occasions. Dr. Lugo noted that the plaintiff had been and continued to be depressed and overwhelmed as a result of her meeting with the Board. Dr. Lugo prescribed antidepressants for the plaintiff and offered supportive therapy. When it became apparent that the plaintiff would need longer term care, Dr. Lugo referred the plaintiff to another psychiatrist, Dr. Barbara Smith.
16. From March 19, 1993 through at least the date of Dr. Smith's deposition, Dr. Smith has seen and treated the plaintiff on a regular basis. Dr. Smith has noted the continued presence of the following symptoms as regards the plaintiff: difficulty sleeping, a heightened state of arousal, fast heart rate, sweaty palms, nausea, tremor, shortness of breath, hives, anxiety, intense sadness, fatigue, decreased concentration, intrusive recollections and avoidance of those recollections. Dr. Smith has treated the plaintiff with a variety of medications, in addition to therapy.
17. Prior to February 12, 1993, the plaintiff had no history of mental illness.
18. Beginning in July 1994, the plaintiff opened an antique shop where she worked part-time.
19. Beginning in January 1995, the plaintiff applied and interviewed for the directorships of three human services agencies: the YMCA of Winston-Salem, United Services for Older Adults and the Community Clinic of High Point. All three positions were equivalent, in terms of compensation and responsibility, to the plaintiff's position with defendant-employer. The plaintiff was not hired for any of these three positions.
20. Apart from the part-time work at the antique shop, the plaintiff has not worked since February 13, 1993.
21. Plaintiff was also seen and evaluated by Dr. Bob Rollins, a consultant in forensic psychiatry. Plaintiff, as a result of her incident of February 12th 13th, 1993 involving her meeting with the Board of Directors of defendant-employer, experienced an adjustment disorder with mixed anxiety and depressed mood.
22. As the executive director or CEO of defendant-employer, plaintiff was responsible for the management of all aspects of defendant-employer's non-profit business. This included appearing before the Board, individually and with members of her management team, to answer questions from Board members and to participate in discussing management issues with them. By virtue of plaintiff's experience and education, she is aware or ought to be aware that answering to a Board of Directors can sometimes involve tense and stressful confrontations involving the operations of the defendant-employer. Consequently, the Board's questioning of plaintiff in an aggressive manner did not constitute an unexpected, unusual or undesigned occurrence; nor did it constitute an interruption of the work routine and the introduction thereby of unusual conditions likely to result in unexpected consequences. Plaintiff was told prior to the meeting that she would be questioned about the Employment Security Commission survey results.
********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Plaintiff did not sustain an injury by accident arising out of and in the course of her employment with defendant-employer as defined by the North Carolina Workers' Compensation Act. Plaintiff is, therefore, not entitled to workers' compensation benefits. N.C.G.S. § 97-2(6).
********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. Plaintiff's claim under the law must be, and is hereby, DENIED.
2. Each side shall pay its own costs.
 S/ __________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ ________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ ________________ LAURA K. MAVRETIC COMMISSIONER
BSB:md